Geoli Investment Company v. Commissioner. Eccdor Investment Company v. Commissioner.
Geoli Inv. Co. v. Commissioner
Docket Nos. 6466-66 and 6486-66.
United States Tax Court
T.C. Memo 1970-77; 1970 Tax Ct. Memo LEXIS 282; 29 T.C.M. (CCH) 349; T.C.M. (RIA) 70077; March 31, 1970, Filed Stephen H. Anderson and Alonzo W. Watson, Jr., Suite 400 Deperat Bldg., 79 South Main St., Salt Lake City, Utah, for the petitioners. Charles W. Nyquist, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the years and in the amounts as follows: 350 Docket No.
Petitioner
Fiscal year
Deficiency
Addition to
Total
ended
tax under
Sec. 531,
I.R.C. 1954
6466-66
Geoli
April 30, 1962
$20,734.63
$13,985.69
$34,720.32
Investment Co
April 30, 1963
24,877.36
16,744.48
41,621.84
April 30, 1964
30,066.25
19,923.11
49,989.36
6486-66
Eccdor
Sept. 30, 1961
5,807.79
5,981.46
11,789.25
Investment Co
Sept. 30, 1962
18,665.69
13,276.03
31,941.72
Sept. 30, 1963
25,705.67
17,397.43
43,103.10
May 31, 1964
22,306.93
14,449.08
36,756.01
*283 Some of the issues, including the issue relating to the accumulated earnings tax imposed by section 531, I.R.C. 1954, [1] have been disposed of by agreement of the parties leaving for our decision the following: Whether respondent properly disallowed, under the provisions of section 269, to each petitioner the deduction for dividends received provided for by section 243. Findings of Fact Some of the facts have been stipulated and are found accordingly. Geoli Investment Co. (hereinafter referred to as Geoli), a corporation organized under the laws of Utah on April 28, 1958, had its principal place of business on the date its petition in this case was filed in Salt Lake City, Utah. Eccdor Investment Co. (hereinafter referred to as Eccdor), a corporation organized under the laws of Utah on September 2, 1958, had its principal place of business on the date its petition in this case was filed at Salt Lake City, Utah. Geoli and Eccdor each filed its Federal corporate income tax return for each of the years here in issue with the district director of internal revenue at Salt Lake City, Utah. *284 George S. Eccles (hereinafter referred to as Eccles) was the organizer of each of the corporations and has been the beneficial owner of all of the stock of Eccdor and Geoli since their incorporation. [2] Each of the corporations issued at the date of its incorporation 100 shares of $10 par value stock for total cash of $1,000. During 1957 and 1958 Eccles was a director and shareholder of Utah Construction Company which was engaged in construction of large projects. The Company would build a commercial building, obtain a tenant on a long-term lease for the building and then offer the building for sale. In 1957 and 1958 Utah Construction Company was engaged in developing an industrial park in South San Francisco, California. At one of *285 the meetings of its board of directors held in the latter part of 1957, each of the directors was offered the opportunity to purchase, upon their completion and leasing but prior to their being offered to the public, some of the commercial buildings in the industrial park. The prices at which the buildings were offered to the directors were the same as the prices at which the buildings were to be offered to the public. Eccles committed himself to purchase two of the buildings when they were completed and leased and some of the other directors agreed to purchase some of the properties upon their completion. The properties which Eccles agreed to purchase were the Par-T-Pak Building and the Cleveland Cap-Screw Building. Prior to agreeing to purchase the properties, Eccles considered the estimated return from investment in real properties as compared to other investments as well as the fact that a substantial portion of the cost could be financed by mortgages at comparatively low interest rates. After committing himself to purchase the two properties, Eccles consulted his lawyer with respect to carrying out his agreement to purchase the properties. The lawyer who Eccles consulted had *286 represented Eccles personally and had represented the banks of which 351 Eccles was an officer and director for over 30 years. This attorney advised Eccles not to take title to the properties in his personal capacity but to acquire them through a corporation. He pointed out to Eccles that taking title to the properties in a corporation would relieve him of personal liability with respect to the buildings and any aspect of their operation, would be better from the standpoint of estate planning if the properties were located outside of Utah and would enable Eccles to borrow money to finance the purchase from his own banks. Eccles and his lawyer also discussed the tax aspects of taking title to the buildings in a corporate name. Eccles then requested his attorney to proceed with the organization of Geoli. After Eccles agreed to purchase the two California properties upon their completion he considered other possible real estate acquisitions in Idaho and Utah. In March of 1958 he began to negotiate for the purchase of the El Paso Natural Gas Building in Salt Lake City, (later named the Pacific Northwest Pipeline Co. Building) and the J.C. Penney Building in Twin Falls, Idaho. The *287 offering prices of the El Paso Natural Gas Building and the J.C. Penney Building were $270,000 and $280,000, respectively. In April 1958 Eccles entered into negotiations for the purchase of the Eccles Hotel Bank Building [3] in Logan, Utah for a price of $105,000. Eccles was successful in purchasing the J.C. Penney property and on May 9, 1958, completed the transaction having title to the property taken in the name of Geoli which as heretofore noted had been incorporated on April 28, 1958. Prior to the incorporation of Geoli, Eccles was aware of the fact that by incorporating a business he was relieved of personal liability. Eccles was an officer and director of the First Security Bank of Utah and the First Security Bank of Idaho, both national banks. Eccles knew even before being so advised by his attorney that he was not permitted to borrow money from these banks in his own name, but that a corporation owned by him would be permitted to do so with proper security. Eccles also knew that because he was a director of these banks he *288 would be required to report any personal borrowing from other sources to the board of directors of the banks, thereby disclosing his personal affairs to other businessmen and associates. Eccles was of the opinion that a corporation owned by him would not be required to make such a report. Eccles also was aware that if he contributed stock to his wholly owned corporation to enable it to have security upon which to borrow the money to purchase real estate that the corporation would be entitled to a deduction for dividends received of 85 percent of the dividends received. Eccles was aware that California and Idaho were community property states and was of the opinion that confusing problems might develop in the probation of his estate if he personally owned real property in those states. In January of 1958 Eccles and his wife purchased a long-term lease for $32,000 on a cottage located on the grounds of the El Dorado Country Club. The El Dorado Country Club is a golf club located at Riverside, California of which Eccles was a member. Its membership includes many prominent people. In June of 1958 Eccles and his wife assigned the lease to Geoli. Eccles occupies the cottage from 4 to 12 *289 weeks each year and at all other times the cottage is available for renting by other club members in accordance with the club's rules. When the buildings Eccles had agreed to purchase from Utah Construction Company were completed and leased, Eccles decided it would be advisable to form another corporation to hold title to these California properties and therefore had his attorney arrange the organization of Eccdor. On September 4, 1958, 2 days after the organization of Eccdor on September 2, 1958, Eccles had title to the Par-T-Pak Building in South San Francisco taken in its name. Petitioners actually purchased from the sellers with whom Eccles had made arrangements the various properties they owned. Petitioners would give a mortgage on the property and borrow the remaining money needed for the purchase on a demand note secured by stock transferred by Eccles to petitioners. The following chart shows all the real property purchased by each petitioner from its incorporation to the time of trial of this case together with the purchase prices, mortgages given, notes given in connection with the purchase, and terms of the leases on the properties when they were purchased: 352 Geoli
Eccdor
Date
purchase
purchase
Original
Property
acquired
price
price
mortgage
J. C. Penney Bldg. Twin
May 9, 1958
$280,000.00
$165,302.55
Falls, Idaho
El Dorado Cottage
June 17, 1958
32,000.00
---
Riverside, Calif.
Par-T-Pak Bldg., South San
Sept. 4, 1958
$145,901.55
95,500.00
Fran- cisco, Calif.
Cleveland Cap- Screw Bldg.
Nov. 11,1958
204,982.49
135,000.00
South San Fran- cisco,
Calif.
Zeno Hydraulic Corp. Bldg.
June 19, 1959
185,000.00
96,897.59
Salt Lake City, Utah
B.F. Goodrich Bldg. Salt
Dec. 19, 1960
246,300.00
160,000.00
Lake City, Utah
Skaggs Drug Center Bldg.
Sept. 16, 1961
350,464.67
225,000.00
Ogden, Utah
*290 Original
Approximate
note
Date of
Term of
monthly
Property
payable
lease
lease
rental
J. C. Penney Bldg. Twin
$114,900.00
March 24,
20 yrs.
2.75 % of
Falls, Idaho
1954
monthly
sales
El Dorado Cottage
Riverside, Calif.
Par-T-Pak Bldg., South San
48,000.00
Sept. 1,
15 yrs.
$1,076.00
Fran- cisco, Calif.
1958
Cleveland Cap- Screw Bldg.
68,000.00
Nov. 1,
15 yrs.
[1] 1,625.00
South San Fran- cisco,
1958
Calif.
Zeno Hydraulic Corp. Bldg.
90,000.00
April 15,
15 yrs.
[1] 1,260.00
Salt Lake City, Utah
1958
B.F. Goodrich Bldg. Salt
90,000.00
Dec. 1,
15 yrs.
[1] 1,642.00
Lake City, Utah
1960
Skaggs Drug Center Bldg.
124,000.00
April 1,
20 yrs.
[1] 2,333.34
Ogden, Utah
1961
[1]
*291 On December 31, 1964, petitioners each purchased for $478,710 a one-fourth ownership in the Shoshone Pipeline Ltd., a partnership. In July 1968, the Shoshone Pipeline interest was sold and petitioners each acquired one-fourth ownership in the Cheyenne Pipeline Co. for $400,000. In order to enable petitioners to finance their real estate purchases, Eccles transferred certain stock which he owned to each petitioner. These stocks were carried on petitioners' books as "paid-in surplus" at their basis to Eccles. The following charts show for each Geoli and Eccdor the dates of transfer of the stocks, the number of shares transferred, and the bases of the stocks in Eccles' hands which is the same bases at which they were carried on the corporate books: Geoli
Investment Company
Number of
shares
Name of company
Eccles' bases
Date
tranferred
issuing stock
in the stocks
1958
May 16
6,000
First Security
$71,721.67
Corporation
May 26
200
Mountain Fuel Supply
16,011.00
Company
May 27
2,333
Farmers Underwriters
72,552.70
Association
May 28
1,000
Utah Construction Company
25,023.80
June 13
3,000
Amalgamated Sugar Company
86,429.77
- common
Balance April
271,738.94
30,1959
1959
Sept. 10
5,000
Amalgamated Sugar Company
20,027.99
- common
Balance April
291,766.93
30,1960
1962
March 1
5,000
Eccles Investment Company
12,128.15
Balance April
$303,895.08
30,1964
Eccdor Investment Company
1958
Sept. 5
5,000
First Security
$42,646.19
Corporation
Nov. 28
8,000
First Security
56,005.29
Corporation
Nov. 28
1,500
Amalgamated Sugar Company
29,799.87
- common
Balance Sept.
128,451.35
30,1959
1962
March 1
10,000
Eccles Investment Company
24,256.30
Balance Sept.
152,707.65
30,1962
1963
Jan. 24.
5,000
Eccles Investment Company
12,128.15
Balance Apr.
$164,835.80
30,1964
*292 Eccles is president of the First Security Corpo Eccles is president of the First Security Corporation. He had owned the 19,000 shares of stock in that company which he contributed to Geoli and Eccdor since 1928. The market value of these shares of stock in 1958 was substantially in excess of Eccles' bases in the stock. Eccles Investment Company is a personal holding company, the assets of which are almost entirely stock. Eccles had owned the 20,000 shares of this stock which he contributed to Geoli and Eccdor since 1912. The market value of this 20,000 shares of stock on April 30, 1964, was approximately $700,000. None of the Eccles Investment Company stock was pledged by Geoli or Eccdor as security for bank borrowing. Most of the stocks contributed to Geoli and Eccdor were held and not sold by them. The only stocks contributed by Eccles to petitioners which were sold by them were 150 shares of common stock of Amalgamated Sugar Company, 900 shares of the First Security Corporation, and 380 shares of Mountain Fuel Supply Company. Petitioners did purchase and sell stocks during the years here in issue. The following chart shows such purchases and sales by petitioners: Geoli Investment Company
Date of
Number of shares
purchase
purchased
Company
Amount
July 7, 1958
5
Permanente Cement
$5.10
Company
Jan. 22, 1959
10
Amalgamated Sugar
400.00
Co. - Common
Feb. 10, 1959
35
Amalgamated Sugar
1,400.00
Co.
Sept. 4, 1959
400
Morrison-Knudsen
14,475.00
Company
Oct. 8, 1959
1,411
Amalgamated Sugar
12,699.00
Co. - Preferred
Oct. 1, 1959
3,000
Lucky Mae Uranium
14,981.40
Oct. 8, 1959
3,000
Lucky Mae Uranium
14,400.00
Nov. 5, 1959
900
Aubrey G. Lanston
9,000.00
and Company
April 22, 1960
700
Union Pacific
19,001.90
Railroad Company
Feb. 23, 1961
900
Aubrey G. Lanston
9,000.00
and Co. - Class A
July 21, 1961
2,500
Hidden Splendor
24,884.96
Mining Co. - 6%
preferred
Feb. 16, 1962
200
Husky Oil Company -
20,000.00
6-1/2% preferred
May 4, 1962
205
Husky Oil Company -
20,500.00
6-1/2% preferred
May 21, 1962
500
Union Pacific
16,049.40
Railroad Company
May 23, 1962
400
Utah Power and Light
10,260.00
Company - $1.18
cumulative preferred
B
Sept. 21, 1962
1,000
Cyprus Mines
23,750.00
Corporation
Aug. 23, 1963
600
Husky Oil Company -
60,000.00
6-1/2% preferred
Total stocks
$270,806.76
purchased
Stocks paid in
303,895.08
Total
$574,701.84
Less stocks
sold:
Apr. 20, 1960
200
Amalgamated Sugar
$5,658.00
Co. Common
Apr. 22, 1960
300
Morrison Knudsen Co.
10,875.00
Apr. 22, 1960
380
Mt. Fuel Supply Co.
7,948.50
March 16, 1961
500
First Sec. Invest.
376.18
Co.
Feb. 2, 1962
400
First Sec. Invest.
334.88
Co.
Aug. 22, 1962
400
Utah Power and Light
10,260.00
Co. $1.18 cumulative
pfd.
Sept. 20, 1962
2,500
Hidden Splendor
24,884.96
Mining Co. -
Preferred
July 29, 1963
1,000
Cyprus Mines Corp.
23,750.00
July 29, 1963
100
Morrison Knudsen Co.
3,600.00
Total stocks sold
87,687.52
Balance April
$487,014.32
30, 1964
Eccdor Investment Company
Sept. 4, 1959
900
Morrison-Knudsen
$32,606.27
Company
Nov. 5, 1959
900
Aubrey G. Lanston &
9,000.00
Company
Apr. 20, 1959
200
Amalgamated Sugar
9,800.00
Company - Common
July 21, 1961
2,500
Hidden Splendor
24,884.96
Mining Company
Feb. 16, 1962
200
Husky Oil Company -
20,000.00
6-1/2% pfd.
May 4, 1962
200
Husky Oil Company -
20,000.00
6-1/2% pfd.
May 21, 1962
500
Union Pacific
16,036.83
Railroad Company
May 23, 1962
400
Utah Power & Light
10,260.00
Company - $1.18
cumulative preferred
Sept. 21, 1962
1,000
Cyprus Mines
23,750.00
Corporation
July 3, 1963
400
First Security
20,000.00
Corporation
Aug. 23, 1963
600
Husky Oil Company -
60,000.00
6-1/2% pfd.
Total stocks
$246,338.06
purchased
Stocks paid in
164,835.80
Total
$411,173.86
Less stocks
sold:
Feb. 27, 1961
906
Aubrey G. Lanston &
$9,000.00
Company
Apr. 30, 1962
100
First Security In-
60.44
vestment Company
Aug. 28, 1962
400
Utah Power & Light
10,260.00
Co. - $1.18
cumulative pfd.
Sept. 20, 1962
2,500
Hidden Splendor
24,884.96
Mining Co.
July 29, 1963
750
Cyprus Mines
17,812.50
Corporation
July 29, 1963
400
Morrison-Knudsen Co.
14,500.00
Total stocks sold
76,517.90
Balance April
$334,655.96
30, 1964
*293 Under the lease on the J.C. Penney Building the landlord is liable for taxes, insurance, painting, and redecorating every 5 years, and exterior and structural maintenance and heating and air conditioning repairs and replacement. The monthly rent is computed by a formula of 2.75 percent of the gross monthly sales with a provision that if the annual sales exceed $1,400,000, the lessee may require the landlord to build a second floor according to the specifications set out in the lease. By 1964 only $582 had been added to Geoli's basis in the J.C. Penney Building for capital improvements. The following chart shows the expenses in connection with the J.C. Penney lease and the rents received by Geoli: Fire
Liability
Property
Year
insurance
insurance
tax
Miscellaneous
Rent
1958
$459.52
$227.27
$ 831.23
$ 169.29
Not shown in
the record
1959
404.38
22.47
5,734.80
1,519.26
Not shown in
(Paint-glass)
the record
1960
404.38
5,848.10
Not shown in
the record
1961
$404.38
$205.89
$5,681.26
$ 106.49
$ 29,238.73
(Front door)
1962
404.38
5,687.99
34,541.77
1963
739.85
5,916.22
100.00
37,789.97
*294 In each of the other leases on petitioners' buildings the lessee paid a stated monthly rental and was liable for property taxes, fire and liability insurance, interior repairs and maintenance, and with the exception of the B.F. Goodrich Building for the exterior maintenance and repairs. The lease on the Skaggs Drug Building limited the responsibility of the lessee to $1,000 annually for each interior and exterior repair. The record does not contain the lease on the Par-T-Pak Building. The following charts show petitioners' expenses in connection with each building and the rents received from each building for the years indicated: Year
Property tax
Insurance
Miscellaneous
Rent
Zeno Hydraulic
Building
1959
[1]
[1]
[1]
[1]
1960
$1,693.32
[1]
1961
1,758.20
$ 49.69
$16,878.20
1962
1,908.06
73.25
17,028.06
1963
1,970.58
$25.07
[1]
B.F. Goodrich
Building
1961
2,615.71
80.55
22,319.71
1962
2,858.99
22,562.99
1963
2,952.68
23.92
22,636.68
El Dorado
Cottage
1958
$1,000.00 per
[1]
contract
1959
2,341.50 per
[1]
contract
1960
2,994.93 per
[1]
contract
1961
3,261.65 per
4,930.00
contract
1962
3,173.92 per
4,069.00
contract
1963
3,885.97 per
2,121.50
contract
1959
3,525.68
[2] 80.20
[1]
Par-T-Pak
Building
1958
[2] 80.21
$119.79
[1]
1959
2,188.02
[2] 80.21
[1]
1960
2,155.28
[2] 80.21
[1]
1961
2,421.76
[2] 80.21
[1]
1962
2,431.14
[2] 73.24
15,931.26
1963
2,656.88
[2] 163.23
10,412.24
Cleveland Cap
Screw Building
1958
185.64
[2] 80.20
186.00
[1]
1960
3,418.80
[2] 80.20
[1]
1961
3,146.50
[2] 73.20
n2/ 116.06
[1]
1962
3,146.66
[2]  73.20
19,993.13
1963
3,439.52
[2] 150.23
13,000.00
(short)
Skaggs Drug
Center Building
1960
[1]
1961
3,794.08
[2] 116.06
[1]
1962
4,999.62
37,656.93
1963
5,773.72
[2] 190.10
31,260.91
(short year)
*295 During the years ending April 30, 1959, through 1964, Geoli's total rental income was as follows: Year ended April 30
Rents
1959
$26,778.02
1960
45,369.96
1961
60,029.56
1962
73,366.64
1963
78,201.82
1964
79,658.73
During the years ending September 30, 1959 through 1963 and the short year October 1, 1963 through May 31, 1964, Eccdor's rental income was as follows: Year ended September 30
Rents
1959
$31,325.00
1960
35,255.54
1961
49,959.40
1962
67,710.97
1963
73,581.32
October 1, 1963 throughMay
54,673.15
31, 1964
Neither Eccdor nor Geoli acquired any real estate subsequent to September 1961. Subsequent to the year 1964 Geoli sold the property which was under lease to J.C. Penney Company, and Eccdor sold the properties which were under lease to Cleveland Cap Screw Company and Par-T-Pak. Eccles' personal office is located in the Deseret Building in Salt Lake City. Geoli and Eccdor used this address as their business address. They had no office space separate from Eccles' personal office space and their names are not listed on *296 the building directory. There were no telephone listings for either of petitioners. Neither Geoli nor Eccdor had printed or engraved business stationery. Correspondence carried on in the name of Geoli and Eccdor was on Eccles' letterhead with the name of Geoli or Eccdor always typed below the closing of the letter and often typed at the top. Neither petitioner paid any amounts designated as wages or salaries from the time of its incorporation through the years here in issue. At all times since their formation each petitioner has maintained separate and complete books of account and an active bank account. Regular shareholders and directors meetings have been held by the directors and shareholders of each petitioner and corporate minutes of these meetings have been kept. Each petitioner has entered into various contracts in its own name. From the time of its incorporation to the close of the years here in issue neither petitioner has paid any dividend. During 1958, 1959, and early 1960 Eccles entered into negotiations for the purchase of the Pacific Northwest Pipeline Company Building in Salt Lake City for $270,000. Eccles contemplated purchasing this building for either Geoli *297 or Eccdor. There was a merger between Pacific Northwest Pipeline Company and El Paso Gas and the building was withdrawn from the market. In 1961 Eccles made an offer of $800,000 for the purchase of the W.T. Grant Building and an offer of $800,000 for the Eccles 358 Building in Ogden, Utah. Both of these properties were sold to higher bidders for $850,000 and $1,000,000, respectively. Between 1960 and 1965 Eccles investigated the possibility of purchasing the Strevell Paterson Building, Addressograph Building, Merrill Lynch, Pierce, Fenner & Smith Building and the Blair Motor Company Building, all of Salt Lake City, and the Seattle Garage, Seattle, Washington. For various reasons all five of these buildings were withdrawn from the market. In 1964 Geoli negotiated for the acquisition of a water system in Mexico, but the system was not sold because of its being financed by a local bond issue. The dividend income reported in each of the joint Federal income tax returns filed by Eccles and his wife for the years 1957 through 1964 and the highest income bracket applicable to the income reported on each of these returns are as follows: Dividends
Highest tax
Year
reported
bracket applicable
1957
$139,409.06
75 percent
1958
140,764.82
84 percent
1959
124,386.01
75 percent
1960
156,451.93
78 percent
1961
207,342.63
84 percent
1962
197,411.96
85 percent
1963
197,112.50
1964
225,872.68
*298 Petitioners on their Federal corporate income tax returns for the years in issue reported dividends received and claimed deductions for dividends received in the following amounts:
Dividends
Dividends received
Petitioner
Fiscal year ended
reported
-deductions claimed
Geoli
April 30, 1962
$58,624.81
$49,831.09
Geoli
April 30, 1963
63,464.62
53,944.93
Geoli
April 30, 1964
72,010.56
61,208.96
Eccdor
Sept. 30, 1961
32,106.40
19,359.32
Eccdor
Sept. 30, 1962
54,431.00
43,716.35
Eccdor
Sept. 30, 1963
64,765.10
55,041.84
Eccdor
Sept. 30, 1964
52,712.10
44,805.29
The highest tax bracket applicable to the income reported on the corporation returns filed by each petitioner for its taxable years 1959 through 1963 was 30 percent. The 52 percent bracket was applicable to some of the income reported by each petitioner for the taxable year ended in 1964. Changes in the personal holding company law caused Eccles to have Geoli and Eccdor each purchase an interest in the Shoshone Pipelines, Ltd. After this purchase by petitioners, Shoshone purchased another pipeline, a gasoline plant, producing wells and a small pipeline in New Mexico and *299 Texas. Each of petitioners also acquired an interest in the Cheyenne Pipeline Co., a general partnership operating a gathering and transmission system covering many states. Eccles was active on behalf of both petitioners in negotiating the acquisition of these interests and in the management of both Shoshone and Cheyenne. Eccles was so active in the management of Shoshone on behalf of petitioners that the general partner, Nielsen Enterprises, considered petitioners also to be general partners and inquired of Eccles' attorney whether a change in documentation was necessary. The following show the balance sheets and income statements for Geoli for the years 1959 through 1964: 359 Geoli Investment Company
Comparative Balance Sheet -- April
30, 1959 through April 30, 1964
1959
1960
1961
ASSETS
Cash
$ 3,037.88
$ 8,884.58
$ 17,928.25
Stocks at cost
273,544.04
353,647.83
362,271.65
Stocks-apprec. to market value
388,000.21
667,140.30
993,975.10
Automobile
4,452.80
4,452.80
Less: Accum. depreciation
(311.68)
(2,092.84)
Furniture & fixtures
236.82
1,567.26
Less: Accum. depreciation
(78.91)
Real estate
312,000.00
497,000.00
743,882.00
Less: Accum. depreciation
(9,901.34)
(24,785.50)
(45,172.61)
Total Assets
$966,680.79
$1,506,265.15
$2,076,732.70
LIABILITIES
Mortgage notes payable
$158,945.19
$ 241,365.60
$ 383,737.53
Com. notes payable
122,700.00
243,500.00
297,800.00
Total liabilities
$281,645.19
$ 484,865.60
$ 681,537.53
CAPITAL & RETAINED EARNINGS:
Cap. stock; auth. 1,000 shares of
1,000.00
1,000.00
1,000.00
$10 par val. each issued &
outstand. 100 shares
Paid-in surplus
271,738.94
291,766.93
291,766.93
Surp. aris. from apprec. of stocks
388,000.21
667,140.30
993,975.10
to market val.
Retained earnings
24,296.45
61,492.32
108,453.14
Total capital and retained
685,035.60
1,021,399.55
1,395,195.17
earnings
TOTAL
$966,680.79
$1,506,265.15
$2,076,732.70
Geoli Investment Company
Comparative Statement of Income
and Retained Earnings
For the Fiscal Years Ended April
30, 1959, through April 30, 1964
Dividends
$22,664.24
$38,393.11
$ 44,945.45
Rents
26,778.02
45,369.96
60,029.56
Interest
Gain on sale of securities
3,861.10
9,088.77
Gain on sale of automobile
Total income
$49,442.26
$87,624.17
$114,063.78
Expenses
Interest
12,377.06
22,430.03
29,163.57
Insurance
686.79
500.10
568.32
Property taxes
831.23
5,859.91
7,618.97
Other taxes
20.00
912.28
2,022.37
Depreciation
9,901.34
15,195.84
22,247.18
Automobile
49.05
180.28
Business expense
115.00
1,622.03
650.00
Repairs and maintenance
1,169.29
2,349.50
3,023.93
Miscellaneous
45.10
Total expenses
25,145.81
48,918.74
65,474.62
Income before Federal income taxes
24,296.45
38,705.43
48,589.16
Provision for Federal income tax
1,509.56
1,628.34
(of prior yr.)
Net income
$24,296.45
$37,195.87
$ 46,960.82
Retained earnings
Beginning
$24,296.45
$ 61,492.32
Ending
$24,296.45
$61,492.32
$108,453.14
*300 Geoli Investment Company
Comparative Balance Sheet -- April
30, 1959 through April 30, 1964
1962
1963
1964
ASSETS
Cash
$ 12,339.59
$ 3,324.92
$ 31,320.03
Stocks at cost
418,949.88
454,364.32
487,014.32
Stocks-apprec. to market value
1,078,648.89
1,398,449.08
1,280,752.43
Automobile
4,611.70
4,611.70
4,611.70
Less: Accum. depreciation
(768.64)
(2,301.69)
(3,164.04)
Furniture & fixtures
1,567.26
2,301.98
4,613.87
Less: Accum. depreciation
(235.63)
(409.67)
(725.81)
Real estate
743,882.00
743,882.00
748,467.96
Less: Accum. depreciation
(71,884.32)
(97,067.41)
(120,937.63)
Total Assets
$2,187,110.73
$2,507,155.23
$2,431,952.83
LIABILITIES
Mortgage notes payable
$ 361,732.32
$ 331,966.01
$ 296,488.15
Com. notes payable
277,100.00
241,400.00
245,700.00
Total liabilities
$ 638,832.32
$ 573,366.01
$ 542,188.15
CAPITAL & RETAINED EARNINGS:
Cap. stock; auth. 1,000 shares of
1,000.00
1,000.00
1,000.00
$10 par val. each issued &
outstand. 100 shares
Paid-in surplus
303,895.08
303,895,08
303,895.08
Surp. aris. from apprec. of stocks
1,078,648.89
1,398,449.08
1,280,752.43
to market val.
Retained earnings
164,734.44
230,445.06
304,117.17
Total capital and retained
1,548,278.41
1,933,789.22
1,889,764.68
earnings
TOTAL
$2,187,110.73
$2,507,155.23
$2,431,952.83
Geoli Investment Company
Comparative Statement of Income
and Retained Earnings
For the Fiscal Years Ended April
30, 1959, through April 30, 1964
Dividends
$ 58,624.81
[1] $ 64,302.12
$ 72,010.56
Rents
73,366.64
78,201.82
79,658.73
Interest
200.00
Gain on sale of securities
6,062.56
3,676.08
245.03
Gain on sale of automobile
1,654.16
Total income
$139,708.17
$146,180.02
$152,114.32
Expenses
Interest
34,952.09
32,805.94
29,247.10
Insurance
543.22
404.38
788.84
Property taxes
10,155.57
10,539.79
10,906.05
Other taxes
2,197.09
2,697.14
3,243.79
Depreciation
28,191.19
26,890.18
25,048.71
Automobile
436.47
267.00
522.17
Business expense
644.99
1,248.91
894.26
Repairs and maintenance
3,574.03
3,247.17
3,985.97
Miscellaneous
Total expenses
80,694.65
78,100.51
74,636.89
Income before Federal income taxes
59,013.52
68,079.51
77,477.43
Provision for Federal income tax
2,732.22
2,368.89
3,805.32
(of prior yr.)
Net income
$ 56,281.30
$ 65,710.62
$ 73,672.11
Retained earnings
Beginning
$108,453.14
$164,734.44
$230,445.06
Ending
$164,734.44
$230,445.06
$304,117.17
*301 The following show the balance sheet and income statement for Eccdor for the years 1959 through April 30, 1964: Eccdor Investment Company
Comparative Balance Sheet -- Fiscal
years ended September 30, 1959
through September 30, 1963 and
April 30, 1964
1959
1960
1961
ASSETS
Cash in bank
$ 6,065.54
$ 4,573.24
$ 6,513.55
Stocks at cost
161,057.62
179,857.62
195,742.58
Stocks-apprec. to market value
730,817.38
852,529.88
1,549,982.42
Automobile
1,703.35
1,703.35
Less: Accum. depreciation
(551.54)
(1,153.22)
Real estate
347,734.50
348,109.21
698,948.59
Less: Accum. depreciation
(12,795.84)
(25,630.95)
(51,618.23)
Other assets Accrued interest
Total assets
$1,232,879.20
$1,360,590.81
$2,400,119.04
LIABILITIES
Mortgage notes payable
224,283.14
216,989.90
432,809.31
Commercial notes payable
118,000.00
105,000.00
209,000.00
Lease deposits
2,466.00
2,466.00
2,466.00
Total liabilities
$ 344,749.14
324,455.90
644,275.31
CAPITAL & RETAINED EARNINGS:
Cap. stock: auth. 1,000 shares of
$10 par va. each issued & outstand.
100 shares
1,000.00
1,000.00
1,000.00
Paid-in surplus
128,451.35
128,451.35
128,451.35
Surp. aris. from apprec. of stocks
730,817.38
852,529.88
1,549,982.42
to market value
Retained earnings
27,861.33
54,153.68
76,409.96
Total capital and retained earnings
888,130.06
1,036,134.91
1,755,843.73
TOTAL
$1,232,879.20
$1,360,590.81
$2,400,119.04
Eccdor Investment Company
Comparative Statement of Income and
Retained Earnings
For the Fiscal Years Ended
September 30, 1959 through
September 30, 1963, and
For the 7 Months Ended April 30,
1964
1959
1960
1961
Income
Dividends
$24,725.00
$31,311.25
$32,108.40
Rents
31,325.00
35,255.54
49,959.40
Gain (loss) on sale of securities
Interest
Total income
56,050.00
66,566.79
82,067.80
Expenses
Interest
14,691.50
17,804.03
24,587.06
Insurance
160.23
5,713.70
160.23
Property taxes
185.64
160.23
5,597.94
Other taxes
20.00
1,033.11
1,293.02
Depreciation
12,795.84
13.386.65
26,588.96
Automobile
464.92
Business expense
600.00
Miscellaneous
335.46
123.20
Total expenses
28,188.67
38,220.92
59,292.13
Income before Federal income taxes
27,861.33
28,345.87
22,775.67
Provision for Federal income tax
2,053.52
519.39
(of prior year)
Net income
$27,861.33
$26,292.35
$22,256.28
Retained earnings
Beginning
27,861.33
54,153.68
Ending
$27,861.33
$54,153.68
$76,409.96
*302 Eccdor Investment Company
Comparative Balance Sheet -- Fiscal
years ended September 30, 1959
through September 30, 1963 and
April 30, 1964
1962
1963
1964
ASSETS
Cash in bank
$ 21,908.20
$ 9,871.71
$ 71,655.74
Stocks at cost
274,840.31
334,655.96
334,655.96
Stocks-apprec. to market value
1,445,362.19
1,925,622.79
1,779,631.04
Automobile
1,703.35
1,703.35
1,703.35
Less: Accum. depreciation
(1,203.35)
(1,203.35)
(1,203.35)
Real estate
699,748.63
700,548.67
701,348.71
Less: Accum. depreciation
(73,217.09)
(98,450.46)
(112.392.61)
Other assets Accrued interest
487.50
Total assets
$2,369,142.24
$2,873,236.17
$2,775,398.84
LIABILITIES
Mortgage notes payable
417,775.53
402,615.79
394,727.35
Commercial notes payable
219,000.00
184,000.00
184,000.00
Lease deposits
2,466.00
2,466.00
2,466.00
Total liabilities
639,241.53
589,081.79
581,193.35
CAPITAL & RETAINED EARNINGS:
Cap. stock: auth. 1,000 shares of
$10 par va. each issued & outstand.
100 shares
1,000.00
1,000.00
1,000.00
Paid-in surplus
152,707.65
164,835.80
164,835.80
Surp. aris. from apprec. of stocks
1,445,362.19
1,925,622.79
1,779.631.04
to market value
Retained earnings
130,830.87
192,695.79
248,738.65
Total capital and retained earnings
1,729,900.71
2,284,154.38
2,194,205.49
TOTAL
$2,369,142.24
$2,873,236.17
$2,775,398.84
Eccdor Investment Company
Comparative Statement of Income and
Retained Earnings
For the Fiscal Years Ended
September 30, 1959 through
September 30, 1963, and
For the 7 Months Ended April 30,
1964
1962
1963
April 30,
1964
Income
Dividends
$51,431.00
$64,755.10
$52,712.10
Rents
67,710.97
73,581.32
51,972.15
Gain (loss) on sale of securities
5,215.00
(1,663.89)
Interest
400.00
Total income
124,356.97
136,672.53
105,084.25
Expenses
Interest
35,690.99
32,347.92
15,986.72
Insurance
378.59
146.47
146.47
Property taxes
9,382.42
10,593.05
11,880.64
Other taxes
973.99
2,252.11
2,636.63
Depreciation
21,648.99
25,233.37
13,942.15
Automobile
176.17
126.60
75.26
Business expense
660.00
850.00
850.00
Miscellaneous
Total expenses
68,911.15
71,549.52
45,517.87
Income before Federal income taxes
55,445.82
65,123.01
59,566.38
Provision for Federal income tax
1,024.91
3,258.09
3,523.52
(of prior year)
Net income
$54,420.91
$61,864.92
$ 56,042.86
Retained earnings
Beginning
76,409.96
130,830.87
192,695.79
Ending
$130,830.87
$192,695.79
$248,738.65
*303 361 Each petitioner claimed on its Federal income tax return for each of the years here in issue the deduction provided under section 243 for 85 percent of the dividends received by it from other corporations. Respondent in his notice of deficiency disallowed to each petitioner this claimed deduction for each year here in issue. The explanation given in the notice of deficiency to Geoli was that it had been determined that a principal purpose for your formation was to obtain the benefit of the dividend received deduction on dividends paid on stock contributed to the corporation. Accordingly, the dividend received deductions claimed on your return * * * have been disallowed under the authority of Section 269 of the 1954 Internal Revenue Code. The same explanation was given in the notice of deficiency to Eccdor except that the words "under the authority of Section 269 of the 1954 Internal Revenue Code" were not contained in the statement of explanation of adjustments. Opinion Petitioners take the position that section 269[4] does not authorize respondent to disallow to a corporation the deduction for dividends received *304 provided for under section 243. Petitioners further contend that if respondent is authorized to disallow such a deduction under the provisions of section 269, his disallowance of the claimed deduction to each of petitioners in this case was erroneous since the principal purpose of Eccles in the formation and the acquisition of the stock of each petitioner was not evasion or avoidance of Federal income tax by securing the benefits of the dividends received deductions for each of the corporations. *305 Respondent contends that he is authorized under section 269 to disallow to a corporation a deduction for dividends received and that his disallowance in the instant case was proper since the evidence fails to show that the principal purpose for which Eccles formed each petitioner and acquired its stock was not the evasion or avoidance of Federal income tax by securing the benefit of the deduction for dividends received allowed by section 243. At the outset it might be noted that respondent in his notice of disallowance stated that "a principal purpose" of the formation of each petitioner was to obtain the benefit of a deduction for dividends received. No point is made by petitioners of the use by respondent in his notice of deficiency of the word "a" and not the word "the" which is the word used in section 269. However, petitioners call attention to the fact, and respondent does not contend to the contrary, that in order for respondent's disallowance to each petitioner of the deductions for dividends received to be sustained "the" principal purpose for the acquisition by Eccles of the stock of each petitioner must be tax avoidance. As we stated in Bush Hog Manufacturing Co., 42 T.C. 713, 729 (1964), *306 "under section 269 petitioner need prove only that the evasion or avoidance of tax was not the 'principal purpose' in forming" the corporation. 362 The requirement of section 269 of acquisition of control by a person or a corporation after October 8, 1940, is, of course, met in this case since Eccles became the beneficial owner of all the stock of each petitioner at its formation in 1958. It is now settled that section 269 is applicable whether the contested tax benefit is claimed by the corporation control of which is acquired or by the person who acquired that control. Bush Hog Manufacturing Co., supra. Therefore, if the deduction for dividends received provided for under section 243 is a type of deduction encompassed within the provisions of section 269, the factual determination which must be made in this case is whether the principal purpose of Eccles in forming the two corporate petitioners was to secure the benefit of the deduction for dividends received. From the facts *307 in this case we do not doubt that at the time Eccles was planning the formation of each of petitioners, he considered the advantages which would result from transferring stocks greatly appreciated in value to these corporations as a contribution to capital so that the corporations would be able to borrow funds to finance real estate dealings on the basis of the appreciated values of the stock contributed to them even though Eccles would not have made a disposition of the stock in such a manner as to result in capital gains taxable to him. We do not doubt that in considering the formation of the corporations Eccles also considered the fact that the corporations would be entitled to deductions for 85 percent of the dividends received on the stocks which he contributed to them. In our view the fact that the corporations would be able to use the appreciated value of the stocks as security for amounts borrowed to finance the purchase of real properties under long-term leases was at least as important to Eccles in considering the formation of petitioners as was the fact that the corporations would have available to them the deduction for dividends received. However, in our view of the *308 facts the reason for the formation of Geoli was that Eccles had committed himself to acquire from Utah Construction Company two buildings which were then under construction by that company at such time as the building had been completed and leased for a long term. Eccles testified specifically that he committed himself to acquire the buildings prior to considering how title to the buildings would be taken and that after making the commitment to acquire the buildings he discussed that problem with his attorney. The attorney's testimony substantiated the testimony of Eccles. While the other benefits which might be derived by taking title to the properties in a corporation owned by Eccles were discussed by Eccles and the attorney prior to the actual incorporation of Geoli, our conclusion from the facts is that the advantages of holding income properties which were under long-term leases in a wholly owned corporation as distinguished from holding such property as an individual was a factor in Eccles' decision to form Geoli which was of at least equal weight to any other factor. The fact that the corporate acquisitions could be financed by borrowing on stocks which had appreciated in value, *309 thereby having Eccles personally in no way required to personally guarantee loans so as to be required to disclose his financial affairs to other directors of the banks of which he was an officer and director, was in our view likewise a factor of equal weight to any other factor influencing Eccles' formation of Geoli. The deduction for dividends received which the corporations would obtain with respect to the dividends paid on the stock transferred to them by Eccles was only one factor considered and it was only one of several of Eccles' purposes in forming Geoli. We therefore conclude that the evidence in this case does not support a finding that a tax avoidance purpose exceeded in importance any other purpose in the formation of Geoli and Eccdor. For this reason we hold that a tax avoidance purpose did not constitute the "principal purpose" of the acquisition by Eccles of control of Geoli and Eccdor. Commodores Point Terminal Corporation, 11 T.C. 411, 418 (1948). We have considered the fact that prior to the completion of buildings which Eccles had originally committed himself to purchase, Eccles had agreed to purchase other property and the J.C. Penney Company Building *310 had been purchased by Geoli. However, this does not cause us to change our conclusion that a primary purpose in Eccles' formation of Geoli was to have that corporation take title to the properties he had agreed to purchase from Utah Construction Company. This fact merely shows that prior to the time that the purchase from Utah Construction Company 363 had been consummated, Eccles had arranged to have Geoli purchase other real property which was under long-term lease. It is not completely clear in the record why Eccles formed a second corporation to purchase the two California properties which he had agreed to purchase from Utah Construction Company. Eccles' testimony was to the effect that since these two properties were in California, he considered there to be some advantage in forming Eccdor and having these properties held by a separate corporation from Geoli which had by that time acquired properties in other States. He further testified that he later decided that there was no advantage in having Eccdor hold only California properties. Whatever the motivating factor in the formation of Eccdor about 5 months after Geoli was formed, there was no purpose of tax avoidance by obtaining *311 a deduction for dividends received since such a deduction could have been obtained as well by placing all the rental properties and all the contributed stocks in one as distinguished from two corporations. We therefore conclude that the principal purpose in the formation of Eccdor was not the avoidance of tax by receipt of a deduction for dividends received. Having concluded on the basis of the evidence in this case that the principal purpose of the formation of Geoli and Eccdor was not the avoidance or evasion of Federal income tax by securing the benefit of deductions for dividends received which would not have been available had those corporations not been formed, it is unnecessary for us to discuss whether a deduction for dividends received is within the purview of section 269. It might be noted that this issue has been inherent in two prior cases decided by this Court. [5] In both of these cases we concluded that the principal purpose of the acquisition was not tax avoidance and did not reach the question of the applicability of section 269 to disallow a deduction for dividends received, if any such issue was raised by the parties in either case. *312 Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. While both respondent and petitioner requested the finding that George S. Eccles owned or was the sole beneficial owner of all of petitioners' stock, the chart of outstanding stocks found in the stipulation showed the 100 shares owned as follows: ↩
Name
Number of shares
Amount
George S. Eccles
96
$ 960
Delores Dore Eccles
1
10
S. J. Quinney
1
10
C. U. Benzley
1
10
Grace F. Madison
1
10
Total
100
$1,000
3. The Eccles Hotel Bank Building is not a hotel but derives its name because it had been a hotel owned at an earlier date by the Eccles' family.↩
1. The monthly rental rates are subject to adjustments based on increases in taxes or insurance when paid by petitioners. In all leases, except J.C. Penney, the lessee is liable for all property taxes, assessments, insurance, interior repairs and maintenances and exterior repairs and maintenances. [Petitioners are liable for exterior repairs and maintenance in the B.F. Goodrich lease and for the excess of $1,000 annually for interior and exterior repairs in the Skagg Drug Center Bldg. lease.] The terms of the lease for the Par-T-Pak Bldg. are not shown by the evidence.↩
1. Individual figure not shown in the record. ↩
2. Estimate from Eccdor's tax returns.↩
1. The income tax return for 1963 shows dividends income in the amount of $63,464.62. The statutory notice of deficiency required that $837.50 be included in the dividend income. This adjustment was conceded by petitioner.↩
4. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.↩
5. Commodores Point Terminal Corporation 11 T.C. 411↩ (1948) and Armais Arutunoff, T.c. Memo. 1963-192.